# EXHIBIT C

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   PETER BERGMAN, BOBBIE CASON        )
    and LISA SMITH, individuals,       )
4   on behalf of themselves and        )
    others similarly situated,         )
5                                       )
                        Plaintiffs,    )
6                                       )
7          vs.                         )   No. 1:10-cv-00191
                                        )
8   KINDRED HEALTHCARE, INC., and )
    KINDRED CHICAGO LAKESHORE,         )
    and DOE DEFENDANTS 1-10,           )
9                                       )
                        Defendants.    )

10

11

12          The 30(b)(6) deposition of KINDRED

13   HEALTHCARE OPERATING, INCORPORATED, through

14   RENAY THOMMEN, taken pursuant to the Federal Rules

15   of Civil Procedure of the United States District

16   Courts pertaining to the taking of depositions,

17   taken before PAULINE M. VARGO, a Certified

18   Shorthand Reporter within and for the State of

19   Illinois, C.S.R. No. 84-1573, at Suite 2400,

20   131 South Dearborn Street, Chicago, Illinois, on

21   February 8, 2011, at 9:38 a.m.

22

23

24

Page 17

1    A.    We provide administrative support
2  services to the subsidiaries.
3    Q.    When you say subsidiaries, subsidiaries
4  of whom?
5    A.    Kindred Healthcare Operating, Inc.
6    Q.    Approximately how many subsidiaries of
7  KHOI are there?
8    A.    I don't know for sure.
9    Q.    I want to show you what was previously
10  marked as Exhibit 34.
11    MR. WELLS:  I brought a copy just for you.
12    MR. LAPP:  Thank you.
13  BY MR. WELLS:
14    Q.    My first question is, have you ever seen
15  this document before?
16    A.    Yes, I have.
17    Q.    Do you have any responsibility with
18  respect to the content of this document?
19    A.    No, I do not.
20    Q.    How did you see this document
21  previously?
22    A.    I just get a copy of it.  My manager, my
23  boss gives me a copy of it every year, as well as
24  the 10-Q.

1 payroll accounting.

2    Q.    And the people who process payroll, who

3 do they process payroll for?

4    A.    The legal entities at facilities.

5    Q.    The subsidiaries?

6    A.    Yes.

7    Q.    Do they process payroll for all the

8 subsidiaries?

9    A.    Yes.

10    Q.    And the individuals who do the payroll

11 taxes, do they do payroll taxes for all the

12 subsidiaries?

13    A.    Yes.

14    Q.    And the individuals who do the payroll

15 accounting, do they do the payroll accounting for

16 all the subsidiaries?

17    A.    Yes.

18    Q.    To your knowledge, are there any

19 subsidiaries of KHOI to whom KHOI does not process

20 their payroll?

21    A.    Not to my knowledge.

22    Q.    I want to hand you what will be marked

23 as 40.

24         (WHEREUPON, a certain document

Page 35

1  subsidiaries of KHOI in Exhibit 40, are they in any

2  way structured into -- are they in any way

3  subdivided below KHOI?

4          And by that I mean, underneath KHOI, if

5  we are looking at an organizational chart, is it

6  underneath KHOI, each of these 40 -- each of these

7  entities that you identified all on the same --

8      A.    I don't know.

9      Q.    Other than with respect to payroll

10 services provided to the subsidiaries, what other

11 administrative services does KHOI provide to its

12 subsidiaries?

13     A.    There is information systems, training,

14 licensure and certification, legal services,

15 clinical care support, the purchasing, the taxes,

16 accounts payable, accounts receivable, risk

17 management, insurance programs, benefits, human

18 resources, advice, counseling.  That's all I can

19 think of right off the top of my head.

20     Q.    You said information services?

21     A.    Information systems.

22     Q.    Systems, I'm sorry.  What do you mean by

23 information systems?

24     A.    I'm not sure I understand what you are

Page 42

1      A.    Multiple committees; there are various

2  committees for various tasks.

3      Q.    Can you give me an example of one of

4  these committees?  Like what would be the purpose

5  of one of those committees?

6      MR. LAPP:  Objection, compound, vague and

7  ambiguous.

8  BY THE WITNESS:

9      A.    I guess I need an example of what --

10 BY MR. WELLS:

11     Q.    I'm sorry.

12     A.    I need an example of what type of

13 committee you are looking for, what type,

14 specifics.

15     Q.    Well, is there a committee on, say,

16 compensation?

17     A.    There is a committee that approves any

18 guidelines or that type of thing for compensation,

19 yes.

20     Q.    Okay.  With respect to that committee

21 that approves compensation guidelines, is that

22 committee a standing committee?  In other words,

23 has that always been in existence, to the best of

24 your knowledge?

Page 45

1    BY THE WITNESS:

2        A.    I'm not sure how it -- whether it is

3    bottom-up or top-down.  I don't know.

4    BY MR. WELLS:

5        Q.    Are you aware of any compensation

6    guidelines that have -- that the committee has put

7    forward?

8        A.    Yes.

9        Q.    Can you give me an example of one of

10   those compensation guidelines that you are aware

11   of?

12       A.    I just know a manual that are

13   guidelines.  I'm aware of a manual, guidelines

14   manual.

15       Q.    Okay.  And that compensation guideline

16   manual, are you aware of whether or not the

17   committee created that manual?

18       MR. LAPP:  Objection, vague and ambiguous,

19   lack of foundation, calls for speculation.

20   BY THE WITNESS:

21       A.    I don't know if the committee would --

22   I'm sorry.  What did you say?

23   BY MR. WELLS:

24       Q.    Did they create --

Page 46

1       A.      I'm not sure if they created it or not.

2       Q.      I want to hand you what I think was

3   previously marked as Exhibit 38 and ask if you have

4   seen this document before?

5       A.      Yes.

6       Q.      And what is Exhibit 38?

7       A.      Compensation administration guidelines.

8       Q.      Is this that manual that you were just

9   referring to?

10      A.      Yes.

11      Q.      So with respect to this manual, this

12  manual that came from this compensation committee

13  got sent to whom?

14      MR. LAPP:   Objection, calls for speculation,

15  lack of foundation.

16  BY THE WITNESS:

17      A.      I know it was sent to the CEOs of the

18  facility.  I don't know beyond that who it was sent

19  to.

20  BY MR. WELLS:

21      Q.      The CEOs of all the subsidiaries?

22      A.      Of the subsidiaries and their d/b/a's.

23      Q.      Perfect.  Did you have any role with

24  respect to the guidelines that are set forth in

1    what?

2         MR. LAPP:   Objection, lack of foundation,

3    calls for speculation.

4    BY THE WITNESS:

5         A.    I'm not sure what you are asking.  Be

6    more specific.

7    BY MR. WELLS:

8         Q.    Certainly.  Is there a Hospital Division

9    within KHOI?

10        A.    No.

11        Q.    Is there a Hospital Division within KHI,

12   Kindred Healthcare, Inc.?

13        A.    No.

14        Q.    Is there a Hospital Division -- are you

15   aware of any Hospital Division?

16        A.    There is a Hospital Division that's just

17   a business segment.

18        Q.    Business segment of what?

19        A.    It is for reporting purposes.  It's a --

20   our hospitals as opposed to our nursing homes.

21        Q.    So if I understand correctly, the

22   Hospital Division is for reporting purposes for

23   what?

24        A.    SEC and IRS reporting and accounting

Page 55

1    rules.

2             I'm sorry.  Not IRS.  It's just SEC and

3    accounting.

4       Q.    Is there any other divisions other than

5    the Hospital Division and the nursing homes that

6    you identified?

7       MR. LAPP:  Objection, lack of foundation,

8    calls for speculation, beyond the scope of the

9    topics.

10   BY MR. WELLS:

11      Q.    You can answer, ma'am.

12      A.    There is a Nursing Center Division and a

13   Rehab Division.

14      Q.    So I have the Hospital Division, the

15   nursing homes, the nursing centers and the rehab?

16      A.    Well, nursing homes is the Nursing

17   Center Division.

18      Q.    Okay.  I'm sorry.

19            So I have the Hospital Division, the

20   Nursing Center, and the Rehabilitation.  Are those

21   the only three divisions for SEC and accounting

22   purposes?

23      A.    Yes.

24      MR. LAPP:  Objection.  You are going to have

Page 57

1    That's what I don't understand.

2         MR. LAPP:   Objection, lack of foundation,

3    calls for speculation.

4    BY THE WITNESS:

5         A.    I think you would have to be more

6    specific as to --

7    BY MR. WELLS:

8         Q.    Can you give me an example of a

9    difference in a requirement between the Hospital

10   Division and, say, the nursing center?

11        A.    Not right off the top of my head.   I

12   can't think of it right off the top of my head.

13        Q.    Can you give me an example of the

14   difference between -- for payroll processing, the

15   difference between the Hospital Division and, say,

16   the Rehabilitation Division?

17        A.    The rehabilitation system uses a

18   different timekeeping system.

19        Q.    Okay.   What timekeeping system does the

20   Hospital Division use?

21        A.    It's an internal run system.   It's for

22   billing and for payroll purposes.

23        Q.    Do you know the name of that system?

24        A.    We call it POC.

1           What timekeeping system does the Nursing

2    Center Division use?

3        A.    Kronos.

4        Q.    Kronos, okay.

5              To your knowledge, is there any

6    difference in the Kronos system used in the

7    Hospital Division and the Kronos system used in the

8    Nursing Center Division?

9        MR. LAPP:  Objection, lack of foundation,

10   calls for speculation, beyond the topics, also

11   beyond the topics.

12   BY THE WITNESS:

13       A.    It's the same system.  It's configured

14   different between each facility.  Each facility has

15   its own set of rules.

16   BY MR. WELLS:

17       Q.    Each facility within the Hospital

18   Division?

19       A.    Each facility in both divisions.

20       Q.    To your knowledge, how long has the

21   Kronos system been in use within the Hospital

22   Division?

23       MR. LAPP:  Objection, lack of foundation.

24

Page 63

1      Q.    Within the Hospital Division.

2      A.    Not -- not totally, no.

3      Q.    Who within the Hospital Division was not

4  subject to that 30-minute meal break deduction?

5      A.    The California facilities were not

6  subject.

7      Q.    Okay.  Any other facilities not subject

8  to --

9      A.    Not --

10     MR. LAPP:  Objection.  Calls for -- you said

11  any other facilities.

12     MR. WELLS:  Let me finish my question before

13  you object, Rich.

14     MR. LAPP:  She had started to answer.

15  BY MR. WELLS:

16     Q.    So we don't talk over one another, are

17  there any other facilities within the Hospital

18  Division the prior to May of 2010 other than the

19  California facilities that were not subject to the

20  automatic 30-minute meal break deduction?

21     MR. LAPP:  Objection, calls for speculation,

22  lack of foundation, beyond the scope of the topics.

23  BY MR. WELLS:

24     Q.    Go ahead, ma'am.

Page 64

1     A.    I don't know of any.

2     Q.    To your knowledge, how long were the

3  California facilities not subject to the 30-minute

4  meal break deduction?

5     MR. LAPP:  Objection, lack of foundation,

6  calls for speculation, beyond the topic.

7     THE WITNESS:  Can you repeat the question?

8             (WHEREUPON, the record was read by

9             the reporter as requested.)

10    MR. LAPP:  Also vague and ambiguous and

11 argumentative.

12 BY THE WITNESS:

13    A.    I don't know.

14 BY MR. WELLS:

15    Q.    To your knowledge, since you began

16 working at KHOI, were the California facilities

17 ever subjected to a 30-minute meal break deduction?

18    MR. LAPP:  Objection, lack of foundation,

19 speculation, beyond the topic.

20 BY THE WITNESS:

21    A.    There was a -- there was a decentralized

22 system in place prior to us putting the newest

23 version in, so I don't know the answer to that.

24 BY MR. WELLS:

Page 65

1      Q.     And when did the newest version you

2  referenced go into place?

3      A.     I believe it was in 2005 and 2006.

4      MR. LAPP:  Correct me, but there is no

5  question pending, correct?

6      MR. WELLS:  There is no question pending.

7      MR. LAPP:  Let's take a break.

8      MR. WELLS:  This would be a good time for a

9  bathroom break for all of us.

10                 (WHEREUPON, a recess was had at

11                 10:55 a.m. until 11:09 a.m.)

12     MR. WELLS:  Back on the record.

13  BY MR. WELLS:

14     Q.     Renay, I want to turn back to what's

15  previously marked as Exhibit 11, the HD

16  compensation administration program objectives.

17            I'm not sure if I asked you this, but do

18  you know who received this document?

19     A.     No.

20     Q.     But you said with respect to Exhibit 38,

21  the compensation guidelines, all the CEOs of the

22  individual facilities receive this document?

23     A.     I know it was distributed to the CEOs.

24     Q.     Other than the CEOs, are you aware of

Page 68

1   it have a human resource department?

2       A.     There are multiple human resource

3   departments.

4       Q.     Within KHOI?

5       A.     Yes.

6       Q.     Can you list for me --

7       A.     Or for whom the -- KHOI is the legal

8   entity that the employees are paid by.  There are

9   employees in the human resources departments that

10  are employed by Kindred Healthcare Operating, Inc.

11      MR. WELLS:  I'm sorry.  Can you read back that

12  answer.

13                  (WHEREUPON, the record was read by

14                   the reporter as requested.)

15  BY MR. WELLS:

16      Q.     Within KHOI, you said there was multiple

17  human resource departments?

18      A.     Yes.

19      Q.     Can you identify for me those human

20  resource departments?

21      A.     I'm not sure what you are asking.

22      Q.     You said there was multiple departments,

23  HR departments.  I'd like you to -- does each

24  department go by a name?

1      A.    I don't know.

2      MR. LAPP:  Objection, beyond the scope.

3  BY MR. WELLS:

4      Q.    And do you know who Ross Johnston

5  reports to?

6      MR. LAPP:  Objection, beyond the scope.

7  BY THE WITNESS:

8      A.    No.

9  BY MR. WELLS:

10     Q.    Turning back to Page 657 on Exhibit 38,

11 that last sentence, the Hospital Division human

12 resource department, HDHR, do you see that?

13     A.    Yes.

14     Q.    Is HDHR referring to Jeff Jasnoff's

15 department, HR department?

16     A.    Yes.

17     Q.    Turning to Page 679 -- actually, let's

18 turn back a page, Page 678.

19           To your knowledge, the wage and hour

20 regulations that are in these guidelines, do all of

21 the operating subsidiaries within the Hospital

22 Division operate under these guidelines?

23     A.    I don't know.

24     Q.    But this was distributed to all the CEOs

Page 74

1    within the operating facilities, is that correct?

2         A.    That is my understanding.

3         Q.    Once the guidelines are distributed to

4    the operating subsidiaries, is there any followup

5    between KHOI and the operating subsidiaries

6    regarding the implementation of those guidelines?

7         A.    No, there is not.

8         Q.    So KHOI just serves as here is the

9    guidelines and that's it?

10        MR. LAPP:  Objection, argumentative, vague and

11   ambiguous.

12   BY MR. WELLS:

13        Q.    I'm sorry.  I'm trying to understand.

14   They distribute the guidelines to all the CEOs,

15   correct?

16        A.    They do.

17        Q.    And then once they distribute the

18   guidelines to the CEOs, is there any -- do the CEOs

19   then comment to KHOI with respect to the

20   guidelines?

21        A.    I'm not aware of that.

22        Q.    Earlier you talked about if a guideline

23   needs to be changed, one of the ways that may occur

24   is a facility may report up to KHOI regarding a

Page 75

1  possible change, is that correct?

2       MR. LAPP:  Objection, misstates testimony.

3  BY THE WITNESS:

4       A.    What I said is if a facility is

5  requesting a change or a clarification, what have

6  you, they will request that via the Kindred

7  Healthcare Operating, Inc., KHOI.

8  BY MR. WELLS:

9       Q.    Requesting a change -- I'm sorry.  Were

10 you done?

11      A.    Yes.

12      Q.    I didn't mean to cut you off.

13 Requesting a change of what?

14      MR. LAPP:  Objection, vague and ambiguous.

15 BY THE WITNESS:

16      A.    Change to a policy, I mean, to a manual

17 or a policy.

18 BY MR. WELLS:

19      Q.    Okay.  So the facility requests the

20 change to KHOI?

21      A.    KHOI is the repository.

22      Q.    Repository, what do you mean?

23      A.    For suggested changes from the

24 facilities, from the operators.

Page 88

1    Central being with respect to -- strike that.  Bad

2    question.

3              Within the Kronos system, is there an

4    identifier that breaks it down to the individual

5    employee?

6         A.    I don't know.

7         Q.    With respect to the payroll processing

8    that your group does?

9         A.    Yes.

10        Q.    I want to give you an example.  Nurse

11   Jerry, I'm at an individual facility.  It is my

12   understanding I swipe in and swipe out for work.

13        A.    Correct.

14        Q.    And by swiping in and swiping out, that

15   records my work time?

16   MR. LAPP:  Objection, incomplete hypothetical.

17   BY MR. WELLS:

18        Q.    Is that correct?

19        A.    Yes.

20        Q.    And at the end of, I think -- let me

21   strike that.

22              The Kindred facilities, are they paid on

23   a weekly or biweekly basis?

24        A.    It varies.

Page 96

1    Q.    And let me ask you this.  I should have

2  asked you at the beginning.  I apologize.

3          Approximately how many employees does

4  your group do the payroll processing for?

5    A.    Can you get more specific?

6    Q.    Sure, absolutely.  Approximately how

7  many hourly paid employees does your group do the

8  payroll processing for?

9    A.    I don't know.

10   Q.    Can you approximate for me?  Is it a

11 thousand, 2,000?

12   A.    No, I don't know.

13 MR. LAPP:  Objection, calls for speculation.

14 BY MR. WELLS:

15   Q.    If you want to turn back to -- I think

16 there was -- I've seen somewhere that there is

17 approximately 50,000 Kindred employees in total.  I

18 thought it was referenced somewhere in the 10-K.

19 Is that approximation correct?

20   MR. LAPP:  Objection, lack of foundation,

21 calls for speculation.

22 BY THE WITNESS:

23   A.    No, I don't think so.

24 BY MR. WELLS:

Page 97

1      Q.    Is it lower or higher than that?

2      A.    It's higher.

3      Q.    How much higher, approximately?

4      MR. LAPP:  Objection, calls for speculation.

5  BY MR. WELLS:

6      Q.    55,000?

7      MR. LAPP:  Objection, speculation.

8  BY THE WITNESS:

9      A.    Yes.

10  BY MR. WELLS:

11     Q.    And of those 55,000 total employees,

12  approximately how many does your group do the

13  payroll processing for?

14     A.    All of them.

15     Q.    So you do the payroll processing from

16  the CEOs on down?

17     A.    Yes.

18     Q.    Of those approximately 55,000 employees

19  that your group does payroll processing for,

20  approximately how many of those individuals are

21  hourly paid employees?

22     A.    I don't know.

23     Q.    Is it the majority?

24     MR. LAPP:  Objection, calls for speculation.

Page 147

1  BY MR. WELLS:

2      Q.   Do you know generally if they prepared

3  materials regarding the automatic meal break

4  deduction?

5      MR. LAPP:  Objection, vague and ambiguous.

6  BY THE WITNESS:

7      A.   I don't know.  If that was considered

8  the pay practice, they would have, but I don't

9  know.

10  BY MR. WELLS:

11      Q.   To your knowledge, was the deduction of

12  30 minutes for hourly paid employees who worked

13  over a certain number of hours considered a pay

14  practice within Kindred and its facilities?

15      MR. LAPP:  Objection, lack of foundation,

16  beyond the scope.

17  BY THE WITNESS:

18      A.   Can you repeat that?

19  BY MR. WELLS:

20      Q.   Certainly.  To your knowledge, was the

21  automatic deduction of 30 minutes if an employee

22  worked over a certain number of hours considered a

23  pay practice within Kindred and the individual

24  facilities?

Page 148

1      MR. LAPP:  Objection, lack of foundation,

2  vague and ambiguous, beyond the scope.

3  BY THE WITNESS:

4      A.    A pay practice in what respect, I guess?

5  BY MR. WELLS:

6      Q.    In any respect.

7      MR. LAPP:  Objection, beyond the scope, lack

8  of foundation, vague and ambiguous.

9  BY THE WITNESS:

10     A.    If it was something we had to configure

11 in Kronos, we would consider it a pay practice.

12 BY MR. WELLS:

13     Q.    Was that something you had to configure

14 within Kronos?

15     MR. LAPP:  Objection, asked and answered, also

16 vague and ambiguous, lack of foundation, beyond the

17 scope.

18 BY THE WITNESS:

19     A.    Yes.

20 BY MR. WELLS:

21     Q.    So the deduction had to be configured in

22 Kronos.  Did your staff in any way prepare material

23 for the individual facilities regarding the

24 automatic deduction as it was configured in Kronos?

Page 175

1    able to clock back into the timekeeping system."

2    Do you see that?

3        A.    Yes.

4        Q.    To your knowledge, is that now the

5    procedure for all the facilities that were formerly

6    auto deduct facilities, to have their employees

7    clock out for a minimum of 30 minutes for a meal

8    break?

9        MR. LAPP:  Objection, lack of foundation,

10   beyond the scope of the deposition notice.

11   BY THE WITNESS:

12       A.    Yes.

13   BY MR. WELLS:

14       Q.    And to your knowledge is that -- is the

15   procedure for all the facilities that were formerly

16   meal break auto deduct facilities that if an

17   employee clocks out for their meal break that they

18   cannot clock back in prior to the expiration of 30

19   minutes?

20       MR. LAPP:  Objection, vague and ambiguous,

21   beyond the scope of the deposition notice, lacks

22   foundation.

23   BY THE WITNESS:

24       A.    I don't know for sure.

Page 176

1   BY MR. WELLS:

2        Q.    Are you aware of any facility where

3   that's not the practice?

4        MR. LAPP:  Objection, lack of foundation,

5   beyond the notice.

6   BY THE WITNESS:

7        A.    No.

8   BY MR. WELLS:

9        Q.    Continue on after that sentence I just

10  read.  There is a reference to a time clock

11  feedback form.  Do you see that?

12       A.    Yes.

13       Q.    What is a time clock feedback form?

14       A.    It's a form that some facilities use to

15  provide information about missed punches or any

16  adjustment to the time clock.

17       Q.    You said some facilities use the time

18  clock feedback form.  What facilities don't use the

19  time clock feedback form?

20       MR. LAPP:  Objection, beyond the scope of the

21  deposition, lack of foundation.

22  BY THE WITNESS:

23       A.    I don't know.

24  BY MR. WELLS:

Page 181

1    Q.    And the training was back in 2005, 2006?

2    A.    Yes.

3    Q.    The training back in 2005, 2006 when the

4  new Kronos system went into effect, was there any

5  training at that point regarding if an employee

6  works through lunch this is how you cancel their

7  meal break?

8    A.    I don't know.

9    Q.    To your knowledge, was there any

10 information conveyed from KHOI to the individual

11 facility on this is how you cancel an employee's

12 automatic meal break deduction?

13   A.    I don't know.

14   Q.    To your knowledge, was there any

15 training from KHOI to the individual facility in

16 this is how the automatic meal break deduction

17 works mechanically?

18   A.    I don't know.

19   Q.    I am going to hand you what was

20 previously marked as Exhibit 18, and I ask you if

21 you have ever seen this document before?

22   A.    Yes, I have.

23   Q.    What is Exhibit 18?

24   A.    It's a time clock feedback form.

Page 204

1     Q.    Renay, I want to make sure there is a

2  clean record.  There is a difference between "I

3  don't know" and "I don't recall."  If you don't

4  recall what the ultimate decision was, that's fine.

5     Do you recall other than this committee

6  who else had involvement in selecting the new

7  Kronos system?

8     A.    No.

9     MR. LAPP:  Objection, vague and ambiguous,

10  beyond the scope of discovery.

11  BY MR. WELLS:

12     Q.    After the new Kronos system was

13  selected, did all of the facilities within the

14  Hospital Division switch to the new Kronos system?

15     MR. LAPP:  Objection, beyond the scope of

16  discovery, beyond the scope of the topics.

17  BY THE WITNESS:

18     A.    Ultimately, yes.

19  BY MR. WELLS:

20     Q.    With respect to the automatic deduction

21  that was in effect between 2005, 2006 and May of

22  2010, did those facilities that used the automatic

23  meal break deduction, did that automatic meal break

24  deduction apply to all hourly paid employees within

Page 205

1    those facilities?

2         MR. LAPP:  Objection, lack of foundation,

3    asked and answered and beyond the scope of the

4    deposition topics.

5    BY THE WITNESS:

6         A.    As far as I know it did.

7    BY MR. WELLS:

8         Q.    To your knowledge, does KHOI distribute

9    any policies or procedures or guidelines regarding

10   overtime to the individual facilities?

11        A.    I'm not aware of any.

12        Q.    When KHOI does the payroll processing,

13   that processing you described for me earlier, that

14   PBCs eventually send it to members of your staff,

15   does KHOI retain in any way those records?

16        A.    Which records?

17        Q.    For instance, again, using the example

18   again of Nurse Jerry, I punched in, punched out;

19   eventually my payroll gets processed up through the

20   PBC at my facility; they then forward it on to

21   individuals within your staff ultimately for me to

22   get a check; correct?

23        A.    Not exactly.

24        Q.    Okay.  Where did I --

Page 207

1    A.    No.   There is reports within SAP that

2  the facility has access to or that we could have

3  access to as well, but we don't retain any copies

4  except -- unless it's something the facility has

5  sent us and asked us to key for them.

6    Q.    SAP, is that a computer software

7  program?

8    A.    Yes.

9    Q.    And who has access to SAP in the

10  individual facilities?

11    MR. LAPP:  Objection, beyond the scope, lacks

12  foundation.

13  BY THE WITNESS:

14    A.    The PBCs have access.   There may be

15  others, but the PBCs have access.

16  BY MR. WELLS:

17    Q.    And then people within KHOI have access

18  to the SAP, is that correct?

19    A.    Yes.

20    Q.    How long are those records maintained on

21  the SAP system?

22    A.    We have not purged at this point, so it

23  goes back to the start of SAP.

24    Q.    When did SAP start?

Page 208

1        A.     It was phased in, I believe, between

2    2000 and 2002.

3        Q.     So if someone was to go in to SAP and

4    run a query, does that mean that if, for instance,

5    Nurse Jerry worked there you could pull up the

6    payroll records for Nurse Jerry?

7        MR. LAPP:  Objection, lacks foundation,

8    incomplete hypothetical, goes beyond the scope of

9    this deposition.

10   BY THE WITNESS:

11       A.     We could pull up some data.

12   BY MR. WELLS:

13       Q.     What data could you pull up?

14       MR. LAPP:  Same objection.

15   BY THE WITNESS:

16       A.     Well, what specific data are you --

17   BY MR. WELLS:

18       Q.     I take it you could pull up the

19   individual's name?

20       A.     Yes.

21       Q.     The individual's job classification?

22       A.     Yes.

23       Q.     The individual's rate of pay?

24       A.     Yes.

Page 209

1    Q.    The individual's total hours worked?

2    A.    Yes.

3    Q.    And by "total hours worked," I mean

4  total hours worked for that pay period.

5    A.    Yes.

6    Q.    I guess their address?

7    A.    Yes.

8    Q.    Could you also pull up whether or not

9  they received overtime for that pay period --

10    A.    Yes.

11    Q.    -- and the number of hours of overtime?

12    A.    Yes.

13    Q.    Could you also pull up and see whether

14  or not there was a cancellation of any meal break

15  deduction?

16    A.    No.

17    Q.    Is there any way to review the

18  information contained in SAP to determine if there

19  was a cancellation of a meal break?

20    A.    No.

21    Q.    Is there any data source that you can

22  retrieve whether or not there was a cancellation of

23  a meal break?

24    MR. LAPP:    Objection, lack of foundation,

Page 210

1   beyond the scope of the deposition.

2   BY THE WITNESS:

3        A.     That could be found in Kronos.

4   BY MR. WELLS:

5        Q.     And how long is that information

6   retained in the Kronos system?

7        A.     I don't know.

8        Q.     To your knowledge, has there been any

9   purge of the information retained in the Kronos

10  system?

11       A.     I don't know.

12       Q.     What's the difference in the information

13  that's retained in SAP versus the information

14  retained in Kronos other than the example you just

15  gave me of within Kronos you can identify if a meal

16  break deduction was cancelled?

17       MR. LAPP:   Objection, beyond the scope, lacks

18  foundation.

19  BY THE WITNESS:

20       A.     Kronos is the detail, punch detail

21  information and any adjustments to those punch

22  detail.  But what's in SAP is just the summarized

23  hours of what gets paid.

24  BY MR. WELLS:

Page 221

1  lack of foundation.

2  BY THE WITNESS:

3      A.    I don't know the answer.

4  BY MR. WELLS:

5      Q.    Your staff had involvement in the

6  creation of this summary for the go-live, is that

7  correct?

8      A.    Yes.

9      Q.    And if I understand it correctly, you've

10 prepared the summary on a facility-by-facility

11 basis, is that correct?

12     A.    Yes.

13     Q.    To your knowledge, are you aware of any

14 summary for a go-live that was submitted to an

15 individual facility that used the automatic meal

16 break deduction that did not include the sentence

17 that I read earlier that began "meals shorter than

18 30 minutes are rounded up"?

19     A.    I did not review them all, so I'm not

20 qualified to answer that question.

21     Q.    Are you aware of any facility that did

22 not in fact round up to 30 minutes for meals

23 shorter than 30 minutes?

24     MR. LAPP:  Objection, vague and ambiguous,

Page 222

1  beyond the scope.

2  BY THE WITNESS:

3       A.    I am not.

4       MR. WELLS:  Renay, I have no further questions

5  at this time.  I will note for the record that your

6  counsel has supplied a series of objections to the

7  deposition topics, so there may be some discussion,

8  and we reserve our right to recall you at a later

9  date subject to those discussions.

10      MR. LAPP:  And for the record, counsel should

11  not speak to you directly because that would be

12  prohibited, so you can rest assured that any

13  communications with you will be through your

14  counsel.

15      MR. WELLS:  No further questions, Renay.

16  Thank you very much.  Very informative.  I greatly

17  appreciate your time.  Thank you, ma'am.

18      THE REPORTER:  Signature?

19      MR. LAPP:  We will reserve signature, and

20  we'll take a copy of this.

21                  (WHEREUPON, at 4:27 p.m. the

22                  deposition was concluded.)

23

24