# EXHIBIT F

Page 1

1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2

3

4     PETER BERGMAN, an individual,        )
      on behalf of himself and             )
5     others similarly situated,           )
                                           )
6                       Plaintiffs,        )
                                           )
7         vs.                              ) No. 1:10-cv-00191
                                           )
8     KINDRED HEALTHCARE, INC., and        )
      KINDRED CHICAGO LAKESHORE, and       )
9     DOE DEFENDANTS 1-10,                 )
                                           )
10                      Defendants.        )
      ------------------------------- )

11

12              The deposition of DIANE OTTEMAN, called by
13    the Plaintiffs for examination, taken pursuant to
14    notice and pursuant to the Federal Rules of Civil
15    Procedure for the United States District Courts
16    pertaining to the taking of depositions, taken before
17    Kathy A. O'Donnell, Certified Shorthand Reporter in
18    the State of Illinois, at 131 South Dearborn Street,
19    Suite 2400, Chicago, Illinois, commencing at
20    9:35 a.m. on the 17th day of December, 2010.

21

22

23

24

Page 28

1    A.    Yes.

2    Q.    And then the information as to how much

3    they've worked is tabulated by the Kronos software

4    system?

5    A.    For the hours worked.

6    Q.    For the hours worked.  What happens next?

7    A.    The managers verify the hours worked.

8    Q.    How do they do that?

9    A.    By reviewing the Kronos detail report.

10    Q.    They look at a report that shows the hours

11    that were clocked in and out for each employee?

12    A.    That is correct.

13    Q.    How does that enable them to verify the

14    hours worked?

15    A.    It shows on there if they've missed a

16    punch-in or a punch-out for any reason or if they

17    have missed a shift, did they want to get paid for

18    that.  The manager reviews that just to see if any of

19    those issues appear on that and then make a note to

20    the -- on that report and return it to the payroll

21    and benefits clerk.

22    Q.    Would those essentially be irregularities on

23    the report --

24    A.    Yes.

1      Q.    -- like a missing punch?

2      A.    Yes.

3      Q.    Then after the manager reviews the report

4   looking for those types of irregularities, what

5   happens next?

6      A.    They return that -- They write the

7   corrections on the report, and they would give that

8   to the PBC, to the payroll and benefits clerk, so

9   that they can -- he can make the appropriate changes

10  into the system.

11     Q.    Now, you used the abbreviation PBC for

12  payroll and benefits clerk.  Does that, with regard

13  to Lakeshore, refer to Jim?

14     A.    That is correct.

15     Q.    Then what happens next?

16     A.    He then makes the corrections, again in SAP.

17     Q.    Jim Ginter?

18     A.    Yes.

19     Q.    Is there an interface between the Kronos

20  system and the SAP system?

21     A.    To my knowledge, yes.

22     Q.    Is Mr. Ginter the one responsible for

23  inputting or for allowing that data to be transferred

24  over to the SAP software system?

Page 29

1      Q.    -- like a missing punch?

2      A.    Yes.

3      Q.    Then after the manager reviews the report

4   looking for those types of irregularities, what

5   happens next?

6      A.    They return that -- They write the

7   corrections on the report, and they would give that

8   to the PBC, to the payroll and benefits clerk, so

9   that they can -- he can make the appropriate changes

10  into the system.

11     Q.    Now, you used the abbreviation PBC for

12  payroll and benefits clerk.  Does that, with regard

13  to Lakeshore, refer to Jim?

14     A.    That is correct.

15     Q.    Then what happens next?

16     A.    He then makes the corrections, again in SAP.

17     Q.    Jim Ginter?

18     A.    Yes.

19     Q.    Is there an interface between the Kronos

20  system and the SAP system?

21     A.    To my knowledge, yes.

22     Q.    Is Mr. Ginter the one responsible for

23  inputting or for allowing that data to be transferred

24  over to the SAP software system?

Page 30

1        A.    To my knowledge, he enters the data.

2        Q.    But the corrections that we talked about in

3    the review by the managers, that's done on the Kronos

4    system?

5             MR. LAPP:   Objection, form of the question,

6         vague, ambiguous, misstates.

7    BY THE WITNESS:

8        A.    The changes that -- He actually goes into

9    the SAP system and makes the changes to the hours as

10   well.

11       Q.    Do you know when the SAP system actually

12   records the time that's being physically recorded at

13   the time clocks?

14       A.    I do not have that information.

15       Q.    You don't know when that interface occurs --

16       A.    I do not.

17       Q.    -- between the Kronos system and the SAP

18   system?

19       A.    I do not know that information.

20       Q.    So Mr. Ginter makes the corrections that the

21   managers have flagged?

22       A.    Mm-hmm.

23       Q.    And he does that with regard to the SAP

24   system as well as the Kronos system?

Page 31

1      A.   To my knowledge.

2      Q.   What happens after that, then?

3      A.   After a two-week period of time, the payroll

4  is closed.  He closes the payroll.

5      Q.   What does that mean, to close the payroll?

6      A.   He actually completes entering all the data

7  and notifies the payroll department at KHOI that all

8  the corrections are completed, and then they run the

9  checks.

10     Q.   So he closes the payroll and then notifies

11  KHOI that that period has been reviewed, corrected,

12  and is now ready for them to do whatever they are

13  going to do with it?

14     A.   That is correct.

15     Q.   Do you know what, in fact, they do with that

16  data then?

17     A.   I have no -- I do not know.

18     Q.   Do you know what happens next, then, in the

19  process we've been talking about?

20     A.   The checks are cut.  They are sent to

21  Kindred Lakeshore for distribution unless the

22  individual has direct deposit.  Then it would go to

23  their account if it was direct deposit, but they get

24  a check anyway that just says "direct deposit" on it.

Page 70

1    Q.   Now, under the old policy -- When I say "old
2    policy," you know I'm referring to prior to May 20th,
3    correct?
4    A.   That's correct.
5    Q.   Under the old policy, did the employee punch
6    in or out for their meal break?
7    A.   They did not.
8        MR. LAPP:  I'm going to object to the
9        question.  Also it was duplicative of
10       Interrogatories 9, 10, 11, 12, 13, 14, 15 -- no,
11       not 15, excuse me.
12       MR. LYNCH:  Is that it, Richard?
13       MR. LAPP:  Yeah.
14   BY MR. LYNCH:
15   Q.   So what happened then was the employee would
16   punch in at the beginning the shift?
17   A.   That's correct.
18   Q.   And then at the end of their shift?
19   A.   That's correct.
20   Q.   And then from the payroll standpoint, was
21   there some amount of time, then, that was
22   automatically deducted from those two punch in and
23   punch out periods of time?
24   A.   There was an automatic 30-minute deduction

Page 71

1    that occurred for their meal breaks.

2        Q.    So if an employee clocked in for eight and a

3    half hours from punch in to punch out --

4        A.    Yes.

5        Q.    -- they would have 30 minutes deducted off

6    of their time, and then the payroll system would pay

7    them for eight hours for that day --

8        A.    That's correct.

9        Q.    -- is that correct?

10            MR. LAPP:    Objection to the extent it's an

11        incomplete hypothetical.

12                        (Otteman Deposition Exhibit No. 7

13                         marked for identification.)

14   BY MR. LYNCH:

15       Q.    I'm showing you what we've marked as

16   Exhibit 7, and I'd ask you to take a look at that if

17   you could.

18       A.    Okay.

19       Q.    What is this document?

20       A.    This is the Kindred Employee Handbook.

21       Q.    And you made reference to the employee

22   handbook on different occasions throughout the

23   deposition today.  Is this the handbook you were

24   referring to?

Page 110

1    Q.    Do you recognize this document?

2    A.    I do not.

3    Q.    Do you see that it looks like it appears to

4  be different -- Well, the second page, 1697, it

5  appears to be a break schedule, and it seems to

6  relate to respiratory therapists.  Do you agree with

7  that?

8         MR. LAPP:  Objection, calls for speculation,

9         lack of foundation.

10 BY THE WITNESS:

11   A.    Based on what's on the page, it appears to

12 be for respiratory.

13   Q.    Do you know if -- Do you know how

14 respiratory therapists' breaks for their meals are

15 scheduled at Chicago Lakeshore?

16   A.    I do not know the details on that.

17   Q.    Do you know if the manner in which their

18 breaks are scheduled differs in any way from the

19 other direct patient care employees?

20   A.    I do not know the answer to that.

21   Q.    Do you know if it differs in any way from

22 any other nonexempt employees?

23   A.    I don't know.

24

Page 111

1          (Otteman Deposition Exhibit No. 17

2          marked for identification.)

3  BY MR. LYNCH:

4      Q.   I'm showing you what we've marked as Exhibit

5  No. 17.

6      A.   Okay.

7      Q.   Do you recognize this document?

8      A.   I do not.

9      Q.   Are you aware of any reviews of meal breaks

10  or missed meal breaks that is conducted at Chicago

11  Lakeshore?

12      A.   I am not.

13          (Otteman Deposition Exhibit No. 18

14          marked for identification.)

15  BY MR. LYNCH:

16      Q.   I'm showing you what we marked as Exhibit

17  No. 18.

18      A.   Okay.

19      Q.   Do you recognize this document?

20      A.   Yes, I do.

21      Q.   What is it?

22      A.   It is a time clock feedback form.

23      Q.   What is a time clock feedback form?

24      A.   This is a form that the employees use to --

Page 138

1      A.    He's also the CFO of the Chicago -- THC

2   Chicago facilities.

3      Q.    And then Jack Shapiro, how do you know him?

4      A.    He's the executive director.

5      Q.    Of THC?

6      A.    Of THC, yes.

7      Q.    Do you know whether or not this is the memo

8   that first informed you of the change to the new

9   policy?

10     A.    I do not know the answer to that question.

11                   (Otteman Deposition Exhibit No. 24

12                    marked for identification.)

13  BY MR. LYNCH:

14     Q.    I'm showing you what we marked as Exhibit

15  No. 24 to your deposition.

16     A.    Okay.

17     Q.    Do you recognize this document?

18     A.    Yes, I do.

19     Q.    What is this document?

20     A.    This was a memo from Mr. Schweikart about

21  the elimination of auto-deduction of meal periods.

22     Q.    And do you know whether or not this is the

23  memo that first informed you of the change to the new

24  policy?

Page 139

1     A.    I do not know the answer to that.

2     Q.    Third paragraph down it says, "One

3  interesting thing I learned that may be part of this

4  is that once an employee clocks out for lunch, the

5  clock will not allow them to clock back in for

6  30 minutes.  Not sure if that will stick, but was

7  part of discussion I had with payroll management this

8  morning."  Do you know what Mr. Schweikart meant by

9  payroll management?

10         MR. LAPP:   Objection, calls for speculation.

11 BY THE WITNESS:

12    A.    I do not.

13    Q.    Have you ever heard that phrase used in your

14 work?

15    A.    I have not.

16    Q.    Next paragraph starts with "Support

17 Center" -- and you'll see both "Support" and "Center"

18 are both capitalized -- "payroll plans a

19 communication campaign with our PBCs once they know

20 the Go-Live date this week."  What does the Support

21 Center refer to, if you know?

22    A.    I do not know.

23    Q.    And then the last paragraph says, "I expect

24 communication from Division/Support Center."  Do you

Page 140

1  know what Mr. Schweikart meant by Division/Support

2  Center?

3        A.   I do not know.

4                   (Otteman Deposition Exhibit No. 25

5                   marked for identification.)

6  BY MR. LYNCH:

7        Q.   I'm showing you what we've marked as Exhibit

8  No. 25 to your deposition.

9        A.   Okay.

10       Q.   Do you recognize this document?

11       A.   Yes, I do.

12       Q.   What is it?

13       A.   It is an interoffice memorandum from me to

14 the Kindred staff regarding the 30-minute meal breaks

15 and the time clocks.

16       Q.   And why did you send this out?

17       A.   To notify the staff of the change that would

18 occur May 20th related to meal breaks and time

19 clocks.

20       Q.   Were you instructed by anyone to send this

21 out?

22       A.   I was not.

23       Q.   Did you send this out as a result of

24 receiving the information that you indicated was from

Page 141

1    KHOI that there would be a change to this effect?

2          MR. LAPP:  Objection, vague and ambiguous.

3    BY THE WITNESS:

4          A.   I don't know that it was related to that or

5    not.  I can't answer that question.

6          Q.   Are you creating this policy by sending this

7    out?

8          A.   No.  What I was reiterating is what the

9    policy would be moving forward.

10         Q.   And I'm just trying to clarify.  I mean,

11   this is the policy as you understood it to be moving

12   forward as it was related to you by others, correct?

13         MR. LAPP:  Objection, misstates, vague and

14       ambiguous.

15   BY THE WITNESS:

16         A.   I created this memo so that I could provide

17   information to the staff at Kindred Chicago Lakeshore

18   regarding the 30-minute meal break expectations.

19         Q.   Under the new policy?

20         A.   Under the new -- Yes.

21         Q.   But you didn't implement the new policy on

22   your own; someone else told you that the new policy

23   was going to be implemented, correct?

24         MR. LAPP:  Objection, vague and ambiguous,

Page 142

1    misstates.

2  BY THE WITNESS:

3       A.    I took the information from the -- that was

4  provided related to the 30-minute meal breaks and put

5  it in this format for the staff at Kindred Chicago

6  Lakeshore.

7       Q.    What information was provided specifically

8  that you're referring to now?

9       A.    The information regarding the 30-minute meal

10  breaks.

11       Q.    You mean the new policy?

12       A.    The new -- There was a new policy that was

13  provided to us from KHOI.

14       Q.    So this is your memo conveying the

15  information that you received from KHOI to your

16  staff?

17       A.    That is correct.

18       Q.    Do you see under the second bullet point

19  under the second paragraph you indicated, "The time

20  clock will not allow you to punch back in within the

21  30-minute time frame; therefore, if your meal is

22  interrupted, you must complete a time clock feedback

23  form and give it to your supervisor for signature"?

24  Do you see that?